1  Tobin Sather, Pro-Se
   Kenneth Lawrence, Pro-Se
2  P.O. BOX 2049
   AHCC / M-Unit
3  Airway Heights, WA. 99001

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JAN 2 8 2022

SEAN F. McAVOY, CLERK
_____ DEPUTY
SPOKANE, WASHINGTON

5
                    UNITED STATES DISTRICT COURT
6                             FOR THE
                    EASTERN DISTRICT OF WASHINGTON
7
   TOBIN SATHER and KENNETH LAWRENCE,    ) Case No. **2:22-cv-00014-TOR**
8  individually, on behalf of a class    )
   of others similarly situated,         ) **CLASS ACTION COMPLAINT**
9  Plaintiffs,                           )
                                         ) Civil Rights Action
10 v.                                    ) (42 U.S.C. §1983) – Negligence
                                         )
11 STATE OF WASHINGTON; JAY INSLEE;      )
   STEPHEN SINCLAIR; CHERYL STRANGE;     ) **JURY TRIAL REQUESTED**
12 SEAN MURPHY; JEFF UTTECHT; RON HAYNES;)
   SARAH SYTSMA; DR. SARAH KARIKO; and   )
13 GREG MILLER,                          )
                                         )
14 Defendants.                           )

15
                    **I. PRELIMINARY STATEMENT**
16
       1.    This is a civil rights and negligence action against the above-
17
   named parties for the wanton and/or deliberately indifferent and/or negligent
18
   infliction of pain and suffering on the prisoners of the Washington State
19
   Department of Corrections (WDOC) as a result of Defendants' failure to use
20
   reasonable care in protecting the Plaintiffs and the Class Members from
21
   heightened exposure to a serious communicable disease. The COVID-19 pandemic
22
   poses an immediate and/or future risk to the health of WDOC prisoners, for
23
   whom the Defendants are responsible.
24
       2.    Although WDOC adopted some policies in the response to COVID-19
25

it largely has neglected the critical measures necessary to prevent outbreaks and transmissions of COVID-19 within DOC facilities and the severe illness and/or serious deprivations of basic human needs which have accompanied, and continue to accompany, COVID-19 infections in congregated WDOC facilities.

3.    A successful and adequate response to this pandemic could not and can not be accomplished where acquiescence to unconstitutional behavior of subordinates permits defiance and willful disobedience in regards to lawful mandates created for the purpose of protecting the Plaintiffs and the Damages Class.

4.    Defendants' can persistently violate their statutory duty to the Plaintiffs and class members by failing to adequately investigate and/or monitor subordinate behavior, and by failing to be responsible for preventing it.

5.    Furthermore, Defendants' can violate their statutory duty by also failing to abide by these lawful mandates, or by failing to adequately staff, provide training/education, or supervise WDOC facility's response to the COVID-19 outbreaks within the respective facility.

6.    Defendants' wanton disregard for the public health threat caused by COVID-19 is made manifest by the continued existence of WDOC's prison conditions which, themselves, are so dangerous or injurious to prisoners that they amount to half-measures, and thousands have become infected by COVID-19.

7.    In the absence of reasonable care being afforded by Defendants, the Plaintiffs and class members have been harmed, and continue to be harmed, in their right to be free from heightened exposure to the COVID-19 virus.

8.     Through this Complaint the Plaintiffs will allege that within WDOC facilities there exists an egregious COVID-19 infection rate, which, in and of themselves show Defendants' adopted policies are inadequate and/or ineffective in regards to preventing the spread of COVID-19 in WDOC prisons, because as many as 6,500 persons in their care have been infected with the COVID-19 virus. Measured against the surrounding communities in Washington State, which reports an average eight-percent infection rate, the forty-percent average among Washington's incarcerated population suggests adults entrusted to the Defendants' care face a manifest disparity when it comes to COVID-19 prevention measures.

9.     Under the totality of circumstances to be alleged within this Complaint by the Plaintiffs, and the fact that willfully exposing someone to the COVID-19 virus is incontrovertibly intolerable to today's society, the Plaintiffs and Class Members now turn to the Court with the hope of bettering the conditions of their confinement. Their is a growing belief among WDOC prisoners, "any sentence served in a WDOC [prison] has become a game of Russian-roulette, and with COVID-19, WDOC has us all on death-row."

10.     Defendants allege that since the beginning of the pandemic, they have relied on guidance from the Washington Department of Health (WDOH) and the Center for Disease Control and Prevention (CDC). If true, Defendants' knew and/or should have reasonably known, that quarantining those exposed to COVID-19 reduces the chances for exposure in WDOC facilities. And, through this Complaint, Plaintiffs seek to demonstrate that since the onset of COVID-19 outbreaks in WDOC facilities, the Defendants have ignored this world-wide practiced prevention measure.

11.    Because the Defendants continue to make and enforce half-measure policies which manifestly create a risk of furthering/spreading the COVID-19 virus in all of WDOC's facilities, willfully refused to protect the people in their care by not prohibiting unvaccinated and/or exposed staff from having contact with people living in WDOC facilities, and persistently refuse to end the dangerous conditions they have foisted upon the incarcerated populations of WDOC's adult facilities – they have violated their official and individual duties under the Eighth Amendment of the U.S. Constitution and Article I, § 14 of Washington's Constitution by keeping the Plaintiffs and the Damages Class free from "cruel and inhumane punishment"; as well as, but not limited to, their common law duty to protect the health, welfare, and safety of the Plaintiffs and all members of the class.

12.    Accordingly, Plaintiffs ask this Court to certify the proposed class, to enter a preliminary injunction requiring Defendants to refrain from any action this Court may deem as retaliatory, to order the appointment of a federal class counsel, and upon a weighing of the evidence – declare that the Defendants have violated their constitutional duty to keep Plaintiffs and the Class free from cruel and inhumane punishment, and that Defendants have also violated their common law duty to protect the Plaintiffs' and members of the Class's health, welfare, and safety.

## II.    JURISDICTION

1.    This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), (4), and supplemental jurisdiction of the state tort claim under 28 U.S.C. § 1367.

**VENUE**

2.    Venue is proper in this Court because the events giving rise to this action occurred at WDOC facilities that are located in the State of Washington.

3.    All Defendants are believed to reside within the State of Washington. 28 U.S.C. § 1391(b).

4.    The acts pertaining to the named Plaintiffs occurred in Spokane County, Washington.

5.    The main policy and operational decisions made by the Defendants as they pertain to the Washington Department of Corrections (WDOC) – occur in Thurston County, Washington.

**III.    PARTIES**

1.    Plaintiff Tobin Sather is a prisoner at the Airway Heights Corrections Center (AHCC) in Airway Heights, Washington. Mr. Sather is among the first adults to test positive for COVID-19 at AHCC during the November 2020 outbreak at this WDOC facility. As early as June of 2020, AHCC's medical department informed Mr. Sather that he was at a "high risk" of being infected with COVID-19, because of his known morbidities – i.e. diabetes, asplenia, and/or high blood pressure. On November 23, 2020 Mr. Sather was tested for COVID-19, and on November 28, Mr. Sather was placed in quarantine with a fever, as well as, a variety of other symptoms. Plaintiff tested positive for COVID-19 during the Damages Class period.

2.    Plaintiff Kenneth Lawrence was housed with Plaintiff Sather at all times material to this Complaint. On November 27, 2020 Mr. Lawrence tested "negative" for COVID-19. However, on December 1, 2020, Mr. Lawrence tested

**COMPLAINT**
Page 5 of 56

1  positive for COVID-19 after being housed with Mr. Sather 24-hours a day prior
2  to testing positive. Plaintiff Lawrence tested positive during the Damages
3  Class period.

4       3.    Defendant State of Washington (the "State") is a sovereign state
5  entity within the United States, and has capacity to sue and be sued pursuant
6  to the Washington Tort Claims Act. The Washington Department of Corrections
7  (WDOC) is a department or division of the State. The State is liable in a
8  state tort action for the omissions and/or misfeasances of WDOC's agents.

9       4.    Defendant Jay Inslee is the Governor of Washington State, and
10  retains ultimate executive authority over WDOC. Under RCW 43.06.010(1), "[t]he
11  governor shall supervise the conduct of all executive and ministerial offices"
12  ; (12), "[t]he governor may, after finding that a public disorder, disaster,
13  energy emergency, or riot exists within this state or any part thereof which
14  effects life, health, property, or the public peace, proclaim a state of
15  emergency in the area effected, and the powers granted the governor during a
16  state of emergency shall be effective only within the area described in the
17  proclamation..." Under RCW 43.06.220(1)(h), and after declaring a state of
18  emergency by proclamation, Governor Inslee is also authorized to order,
19  "[s]uch other activities as he or she reasonably believes should be prohibited
20  to help preserve and maintain life, health, property or the public peace."
21  Furthermore, pursuant to RCW 43.06.220(2)(g), Governor Inslee is authorized
22  to waive and/or suspend, "[s]uch other statutory and regulatory obligations or
23  limitations prescribing the procedures for conduct of state business, or the
24  orders, rules, or regulations of any state agency if strict compliance with
25  the provisions of any statute, order, rule, or regulation would in any way

1 prevent, hinder, or delay necessary action in coping with the emergency..."
2 See also, Washington's Laws of 2019 [2019 c 472 § 1(2)]. At all times relevant
3 Governor Jay Inslee was acting under color of  law and is sued in his official
4 and individual capacities.

5      5.   Defendant Stephen Sinclair is the former WDOC Secretary of
6 Corrections, and before relinquishing the powers of that office, he was fully
7 and personally responsible for WDOC's response to the COVID-19 outbreak in
8 WDOC's facilities throughout the year 2020. At all times relevant, and during
9 his appointment to the office of Secretary of Corrections, Defendant Sinclair
10 was acting under color of law. However, as he no longer enjoys an official
11 capacity, Defendant Sinclair is only sued in his individual capacity for his
12 knowing omissions and the misfeasances alleged against him herein.

13      6.   Defendant Cheryl Strange is WDOC's Secretary of Corrections,
14 having inherited the office from her predecessor Stephen Sinclair - upon
15 gubernatorial appointment, and consent of Washington's Senate. (See RCW 72.09.
16 030). Defendant Strange assumed the responsibility of that office during the
17 uncontrolled COVID-19 outbreak in WDOC's facilities, and does by virtue of
18 the "official capacity" rule of law - inherit the claims held within this
19 Complaint against the office of WDOC's Secretary of Corrections. Under RCW
20 72.09.050, Defendant Strange is directly responsible for the management of the
21 Washington Department of Corrections, and is directly responsible for the
22 administration of adult correctional programs. "The secretary is authorized to
23 promulgate standards for the department of corrections within appropriate
24 levels authorized by the legislature." Supra. While acting on behalf of WDOC,
25 Defendant Strange, "shall exercise all powers and perform all duties

1   prescribed by law with respect to the administration of any adult correctional
2   program by the department of corrections." RCW 72.02.040. Under RCW 72.09.060
3   (1), Defendant Strange is liable for the actions or inactions of Washington's
4   Correctional Industries (WCI) division. Defendant Strange is also responsible
5   for the making of rules within the WDOC's prison health care programs and is
6   directly responsible for ensuring such rules comply with state and federal
7   laws. WDOC operates 12 adult correctional facilities in Washington, where
8   adult prisoners are held after receiving a sentence to incarceration term
9   longer than one-year. At all times relevant, the WDOC Secretary of Corrections
10  was acting under color of law, and accordingly, Defendant Cheryl Strange, who
11  is the lawfully appointed successor of Stephen Sinclair, is also sued in her
12  official and individual capacities.

13         7.     Defendant Sean Murphy is the Deputy Secretary of WDOC, and is
14  directly responsible for ensuring that WDOC's prison health programs comply
15  with state and federal laws – including, but not limited to, COVID-19 mandates
16  which establish social distancing guidelines, and facial covering regulations.
17  Defendant Murphy, like Defendant Strange, lawfully inherits any and/or all
18  "official capacity" claims which may implicate a predecessor – as Defendant
19  Murphy assumed office during the acts alleged herein. Therefore, and because
20  under his appointment to the office of Deputy Secretary conditions have not
21  changed, Defendant Murphy has acted under color of law, and is accordingly
22  sued in his official and individual capacities.

23         8.     Defendant Jeff Uttecht is the Deputy Director of WDOC's Eastern
24  Command, and is directly responsible for the operations of four WDOC prisons:
25  Airway Heights Corrections Center (AHCC), Coyote Ridge Correctional Center

1  (CRCC), Larch Corrections Center (LCC), and the Washington State Penitentiary
2  (WSP). At all times relevant, Defendant Uttecht was acting under color of law
3  and is sued in his official and individual capacities.

4          9.    Defendant Ron Haynes is the Deputy Director of WDOC's Western
5  Command, and is directly responsible for the operations of eight WDOC prisons:
6  Cedar Creek Corrections Center (CCCC), Clallam Bay Corrections Center (CBCC),
7  Mission Creek Corrections Center for Women (MCCCW), Monroe Correctional Center
8  (MCC), Olympics Corrections Center (OCC), Stafford Creek Corrections Center
9  (SCCC), Washington Corrections Center (WCC), and the Washington Corrections
10 Center for Women (WCCW). At all times relevant, Defendant Haynes was acting
11 under color of law and is sued in his official and individual capacities.

12         10.   Defendant Sarah Sytsma is the Administrator for Washington's
13 Correctional Industries (WCI) division, and is directly responsible for the
14 management of operations within WCI's facilities located in WDOC. At all times
15 relevant, Defendant Sytsma was acting under color of law and is sued in her
16 official and individual capacities.

17         11.   Defendant Sarah Kariko is WDOC's Chief Medical Officer of Health
18 Services, and is responsible for the provisions of legally mandated medical,
19 dental, behavioral – mental health care, and pharmacy services to adults in
20 WDOC's custody. At all times relevant, Defendant Dr. Kariko was a decision
21 maker in WDOC's Emergency Operations Center (EOC). At all times relevant,
22 Defendant Kariko was acting under color of law and is sued in her official and
23 individual capacities.

24         12.   Defendant Greg Miller is the WDOC's EOC Manager, which was
25 activated in early 2020 for the purpose of collaboration and decision making

1   in response to the COVID-19 pandemic and outbreaks within WDOC's facilities.
2   Defendant Miller is directly responsible for the management and supervision
3   of EOC programs – authorized by the Secretary of Corrections to oversee and
4   lead the EOC. At all times relevant, Defendant Miller was acting under color
5   of law and is sued in his official and individual capacities.

6                    **IV.    CLASS ACTION ALLEGATIONS**

7            1.    Plaintiffs bring this action in good faith, and
8   pursuant to Federal Rules of Civil Procedures (FRCP) 23(b)(1),
9   23(b)(2), and 23(b)(3), and, in the alterantive, FRCP 23(c)(4),
10  on behalf of themselves and a class of similarly situated
11  individuals.

12           2.    Plaintiffs seek certification of a single class, and
13  to represent the "Damages Class" in this action.

14           3.    The Damages Class consists of all those adults which
15  while incarcerated in WDOC facilities were (1) incarcerated on or
16  after February 29, 2020; (2) while incarcerated, tested positive
17  or were otherwise diagnosed with COVID-19, and (3) if they became
18  incarcerated after February 29, 2020, tested positive or were
19  otherwise diagnosed with COVID-19 at least 14 days after they
20  entered WDOC custody. The class period for the Damages class
21  commences on March 27, 2020. Specifically excluded from the
22  Damages Class are the Defendants and any of their respective
23  affiliates, legal representatives, heirs, successors, employees,
24  or assignees.

25

4.    The Damages Class is so numerous that joinder is impracticable. Upon the date this Complaint is filed, at least 6,500 people incarcerated at WDOC facilities has been diagnosed with a COVID-19 infection. Due to the highly infectious nature of this virus, and the additional, more infectious variants of the COVID-19 that are now circulating globally, it is likely the number of new COVID-19 cases among individuals incarcerated at WDOC facilities will continue to increase. Plaintiffs allege this satisfies FRCP 23(a)(1).

5.    There are one or more questions of fact or law common to members of the Damages Class, including legal questions related to Defendants' duties under the Eighth Amendment and liabilities under 42 U.S.C. § 1983. There are also common questions of fact related to notice upon the Defendants, what steps they took and/or failed to take in regards to protecting people housed within WDOC facilities from becoming infected by the COVID-19 virus, medical causation, scientific evidence admissibility, and applicable CDC and/or the Washington Department of Health (WDOH) standards. In this case, the Defendants completely control the environment, and there is no other path of infection from outside WDOC facilities other than COVID-19 infections transmitted by persons the Defendants have permitted entrance to WDOC facilities. Therefore, causation is a common question of fact among all members of the Damages Class. Plaintiffs allege this satisfies FRCP 23(a)(2).

6.    As to the Damages Class, common questions of fact and law also predominate over questions effecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, in that (a) the class members have little interest or ability to individually control the prosecution of separate

1  actions; (b) as the proposed class includes facilities across the State of
2  Washington, it is appropriate to concentrate the forum in this district, and
3  the Eastern District of Washington is appropriate under Plaintiffs venue
4  claims; and; (c) the difficulties in managing the Damages Class are less than
5  managing a mass of individual claims.

6        7.   The claims of Plaintiffs Sather, Lawrence, and any other person
7  who becomes infected and diagnosed with COVID-19 while entrusted to the care
8  and custody of WDOC, are typical of the claims alleged by the Damages Class,
9  as their claims are based on the same facts and legal theories as those of the
10 Damages Class members.

11       8.   Plaintiffs Sather, Lawrence, and any other Plaintiff who becomes
12 infected and diagnosed with COVID-19 while entrusted to the care and custody
13 of WDOC, are adequate representatives of the Damages Class.

14       9.   With respect to the Damages Class, the representative Plaintiffs
15 have the requisite personal interest in the outcome of this action and will
16 fairly and adequately protect the interests of the members to the Damages
17 Class. Plaintiffs have no interests adverse to the interests of the Damages
18 Class they seek to represent. Plaintiffs have sought, and continue to seek,
19 class counsel who demonstrates experience and success in the prosecution of
20 civil rights litigation, including, but not limited to, seeking appointment
21 of class counsel by this Court – for the purposes of protecting the interests
22 of the Damages Class they seek to represent. Accordingly, Plaintiffs allege
23 FRCP 23(a)(3) and (4) are satisfied.

24       10.  Plaintiffs know of no conflicts among class members.

25

**COMPLAINT**
Page 12 of 56

11.   With respect to the Damages Class, Plaintiffs seek injunctive and declaratory relief. Accordingly, prosecuting separate actions would create the risk of inconsistent or varying adjudications with respect to individual class members which could establish incompatible standards of conduct for the party opposing the class. Further, any injunction or declaratory relief which requires the Defendants to address constitutional violations may prevent other litigants from seeking a different relief – making certification under FRCP 23(b)(1) legally justified. In the alternative, Plaintiffs seek certification of the class under FRCP 23(b)(2), in that all class members are subject to the same constitutionally deficient conduct by Defendants. Notwithstanding the fact that the Defendants have acted on grounds applicable to all class members Plaintiffs allege they will continue to act on grounds generally applicable to all class members in regards to the health, welfare, and safety of the Class.

12.   As to the Damages Class, Plaintiffs seek partial certification under FRCP 23(c)(4). This action may also be maintained as a class action with respect to particular issues, including, but not limited to the following, each of which is also a common question of law or fact under FRCP 23(a)(1):

        (a)   Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to fully and appropriately implement quarantining of both staff and incarcerated individuals as a COVID–19 control strategy – once infection was probable.

        (b)   Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to create an environment where social distancing was a

possible means of protection against becoming infected;

(c) Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to promptly follow CDC and WDOH face covering guidelines, mandates, and/or orders lawfully issued;

(d) Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to keep unvaccinated corrections staff from having contact vulnerable adults in WDOC custody;

(e) Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to prohibit exposed, infected, and/or asymptomatic WDOC staff from having access to WDOC facilities, or in the alternative, permitting said staff to have contact with vulnerable adults in WDOC custody;

(f) Whether Defendants acted with deliberate indifference to the rights of Plaintiffs and class members in failing to prevent contact between those exposed/infected with COVID-19, and those who had not contracted the virus, especially, but not limited to, such cases where those infected where moved from unit to unit, or housed with those reasonably believed to be infected with the virus;

(g) Whether Defendants acted negligently in failing to fully and appropriately quarantine all exposed/infected staff and/or incarcerated adults as a COVID-19 control strategy;

(h)  Whether Defendants acted negligently in failing to create an environment where social distancing was a possible means of protection against becoming infected;

(i)  Whether Defendants acted negligently in failing to promptly follow CDC and WDOH face covering guidelines, mandates, and/or orders lawfully issued;

(j)  Whether Defendants acted negligently in failing to keep unvaccinated corrections staff from having contact with vulnerable adults in WDOC custody;

(k)  Whether Defendants acted negligently in failing to prohibit exposed, infected, and/or asymptomatic WDOC staff from having access to WDOC facilities, or in the alternative, permitting said staff to have contact with vulnerable adults in WDOC custody;

(l)  Whether Defendants acted negligently in failing to prevent contact between those exposed/infected with COVID-19, and those who had not contracted the virus, especially, but not limited to, such cases where those infected were moved from unit to unit, or housed with those reasonably believed to be infected with the virus;

(m) Whether Defendants acted negligently in failing to protect incarcerated adults in their care by providing an EPA approved COVID-19 disinfectant;

(n)  Whether Defendants' conduct caused injury to Plaintiffs and class members;

**COMPLAINT**
Page 15 of 56

1         (o)  Whether Plaintiffs and class members are entitled to

2              recover punitive damages; and

3         (p)  The amount of punitive damages to which Plaintiffs and

4              class members are entitled.

5      13.   With respect to the Damages Class, Plaintiffs assert this action

6 has been brought in good faith, and may be properly maintained as a class

7 action under federal law, having satisfied the requirements for maintaining a

8 class action under FRCP 23(a).

9                      **V.   FACTUAL ALLEGATIONS**

10     1.   Since 2019, the novel corona-virus, or COVID-19, has ravaged the

11 United States. The extensive body of evidence regarding COVID-19 demonstrates

12 that COVID-19, and it's variants, are a serious and highly communicable virus

13 which spreads through close contact with individuals whom have contracted or

14 become exposed to COVID-19.

15     2.   COVID-19 infections can range in severity, with the mildest

16 cases showing few to no symptoms, the majority presenting as moderate to

17 severe respiratory symptoms (e.g. cough, difficulty breathing, congestion,

18 sore throat, loss of smell and/or taste, and fever), while the most serious

19 cases can result in long-term critical illnesses and/or death.

20     3.   The transmission of COVID-19 has grown exponentially and is

21 expected to mutate into different variants as it's growth continues to spread

22 exponentially. The World Health Organization (WHO) has classified COVID-19 as

23 a worldwide pandemic, and as of November 11, 2021, approximately 251,266,207

24 cases of COVID-19 have been recorded worldwide. The death toll of this virus

25

1   now exceeds 5,070,244.[1] On a national scale, the United States has confirmed

2   46,626,034 cases, and 755,201 deaths since the outset of the pandemic.[2]

3       4.   In Washington State alone, there have been a total of 657,469

4   cases, and 8,857 deaths.[3] In short, COVID-19 has proven itself to be the most

5   manifest global health crises in living memory.

6   **A.  Facts related to COVID-19 and its impact in WDOC prisons:**

7       5.   In WDOC facilities, as many as 6,797 incarcerated adults have

8   tested positive for COVID-19, and approximately 15 people have died as a

9   result of their infection.[4]

10      6.   As of November 11, 2021, WDOC reports that at least forty-one

11  percent of the adults in their custody statewide have tested positive for

12  COVID-19.[5]

13  _____

14  [1] WHO Coronavirus (COVID-19) Dashboard, World Health Organization, https://covid19.who.int/ (last visited Nov. 11, 2021).

15  [2] COVID Data Tracker, Center for Disease Control and Prevention, https://covid.cdc.gov/covid-

16  data-tracker/#datatracker-home (last visited Nov. 11, 2021).

17  [3] COVID-19 Data Dashboard, Washington Department of Health, https://www.doh.wa.gov/Emergencies/ COVID19/DataDashboard (last visited Nov. 11, 2021).

18  [4] Confirmed Cases, Washington Department of Corrections, https://www.doc.wa.gov/corrections/

19  covid-19/data.htm#confirmed (last visited Nov. 11, 2021).

20  [5] COVID-19 Comparative Jurisdictions, Washington Department of Corrections, https://www.doc.wa.

    gov/corrections/covid-19/data-comparative-jurisdictions.htm (last visited Nov. 11, 2021).

21  (Between November and December of 2020, this percentage 'per facility' could average as high as

    seventy-five percent of an institutions "Average Daily Population" (ADP) - often proximal to

22  infected adults being moved from unit to unit, and where non-infected adults were housed.

23

24

25

**COMPLAINT**
Page 17 of 56

7.    For the incarcerated adults in WDOC facilities, the COVID-19 health crises has been exponentially more severe in regards to exposure, and heightened rates of infection. WDOC facilities, on average, have a recorded rate of infection that is more than four times greater than that of the general population of Washington State. Statistically, the general population of Washington's communities reports an infection rate equal to 8.7 percent.[6]

8.    In a thirty-day period, recorded between November and December 2020, WDOC facilities (e.g. AHCC, where the Plaintiffs are incarcerated) were reporting infection rates as high as seventy-five percent. Such a rate of infection was more than eight times greater than the comparative infection rates in the surrounding community.[7]

9.    Incarcerated adults in WDOC correctional facilities are at a statistically greater particular risk of harm, are more likely to be exposed to COVID-19, and becoming infected by the virus – than the general public of Washington State.

10.    The general population of Washington State has the capacity to take protective measures for the purpose of protecting themselves from the COVID-19 virus – incarcerated individuals in WDOC facilities cannot. These protective measures include, but are not limited to, access to EPA-registered COVID-19 disinfectants. Also, congregate family environments commonly include individuals who share an interest in the health and safety of those they

---

[6] COVID-19 Data Dashboard, Washington Department of Health, supra. Data was extrapolated from a total population for Washington being 7,656,200 – per the April 2020 census.

[7] Confirmed Cases, Washington Department of Corrections, supra.

1  live with. WDOC facilities however, are crowded congregate environments which

2  are typically populated with individuals who have little more than a desire

3  for self preservation.

4      11.    By structural design, WDOC and WCI facilities do not provide

5  incarcerated adults with the ability to sanitize their environment and/or

6  keep from having contact with surfaces that are likely to become contaminated

7  with the COVID-19 virus.

8  **B.  Facts related to COVID-19 transmission in WDOC prisons:**

9      12.    The transmission of COVID-19 has increased exponentially since

10  the beginning of the pandemic in 2020. Since then, the COVID-19 virus has

11  mutated into several variants, the latest being the "Omicron variant". Though

12  Washington State has not reported any cases of the Omnicron variant, the State

13  did have one of the largest COVID-19 outbreaks in the United States.[8]

14      13.    COVID-19 is a particularly contagious disease. A March 2020

15  study showed that the virus could survive for up to three hours in the air,

16  four hours on copper, twenty-four hours on cardboard, and two to three days on

17  plastic and stainless steel.[9]

18      14.    Research also shows that controlling the spread of COVID-19 is

19  made even more difficult where asymptomatic transmission (i.e. transmission

20  by people who are contagious but because they exhibit limited or no symptoms,

21  [8]  Coronavirus Disease 2019 (COVID-19): Cases in U.S., CDC, https://www.cdc.gov/coronavirus/2019-
22  ncov/cases-updates/cases-in-us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-
    ncov%2Fcases-in-us.html (last visited Jan. 10, 2021).

23  [9]  Marilynn Marchione/AP, "Novel Coronavirus Can Live on Some Surfaces for Up to 3 Days, New Tests
    Show, TIME, (Mar. 11, 2020), available at https://time.com/5801278/coronavirus-stays-on-surfaces-
24  days-tests/.

25

screening tools become ineffective if they are dependent upon identifying symptomatic behavior) is made possible by either ignorance and/or willful negligence.

15.    By structural design, the purpose of a prison is to control the passage through a facility's gates. In regards to WDOC facilities, Defendants' ultimate duty is to be the gatekeepers.

16.    WDOC staff enter from, and exit to, the community surrounding WDOC's 12 facilities – but only by the Defendants' permission. According to Teamster President (of the Local 117), Michelle Woodrow, prior to October 18, 2021, Defendants permitted WDOC staff; who the Defendants knew, or should have reasonable known by diligent screening; who had been exposed and/or where asymptomatic – to enter WDOC facilities across Washington State.[10] Therefore, Defendants' have rendered COVID-19 infection screening procedures to be inadequate to useless in keeping asymptomatic, yet contagious, staff from entering WDOC facilities.

17.    Experts predict that, "[a]ll prisons and jails should anticipate that the coronavirus will enter their facilities."[11]

18.    Expert predictions have borne out in Washington State where, between March 2020 and the filing of this Complaint, the number of COVID-19 infections in WDOC facilities now exceed 6,790 cases, and WDOC's incarcerated

---

[10]    Austin Jenkins, PBS – "Inside Olympia", (Oct. 21, 2021), Interview with Michelle Woodrow.

[11]    Evelyn Cheng and Huileng Tan, CNBC, n.11 (quoting Tyler Winklemand, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research Institute in Minneapolis).

1  population realizing that over forty-one percent have tested positive for the
2  COVID-19 virus in one variant or another.[12]

3       19. The COVID-19 virus has evolved since it's initial discovery.
4  Today, there are at least three different COVID-19 related variants spreading
5  in Washington State; B.1.1.7 (first identified in the United Kingdom), B.1.351
6  (originally detected in South Africa), and P.1 (first identified in travelers
7  from Brazil).[13] Although not reported in Washington State as of yet, there is
8  also the Omicron variant emerging from South Africa in the United States.

9       20.  Each new variant has unique properties which can potentially
10 make them more dangerous than the original COVID-19 strain. These existing or
11 future strains are particularly concerning because they may reduce current
12 vaccination effectiveness.

13      21.  For example, there is evidence to suggest that the Johnson and
14 Johnson vaccine may be less effective against the B.1.351 variant.

15      22.  The totality of current evidence also suggests that no vaccine
16 to date could offer  one-hundred percent immunity against any of the ever
17 increasing COVID-19 variants. This suggests that the vaccinated Plaintiffs
18 and similarly vaccinated Damages Class members – remain susceptible to future
19 infection by the COVID-19 virus.

20  _____

21  [12] COVID-19 Comparative Jurisdictions, Washington Department of Corrections, supra.

22  [13] COVID-19 Variants, Washington State Department of Health, https://www.doh.gov/Emergencies/
    COVID19/Variants (last visited Nov. 11, 2021).
23

24

25

1    23.    An even more concerning threat posed by a COVID-19 infection of
2    a prison community is the potential for the virus, while being allowed to
3    spread out of control, to mutate into a new or more treatment-resistant
4    variant.[14]

5    24.    As demonstrated by the outbreaks in WDOC facilities, prisons
6    also serve as "epidemiological pumps", which amplify conditions ideal for the
7    spread of diseases such as COVID-19.[15]

8    25.    For example, Plaintiffs live in extremely close quarters with
9    one another. Their "two-man cell" is approximately seventy-eight inches wide,
10   one-hundred and twenty-six inches long, and ninety-six inches tall. Their
11   housing unit utilizes a recirculated air system, "which promote[s] the highly
12   efficient spread of disease through droplets."[16] Accordingly, Defendants'
13   "social distancing protocols" are illusory at best.

14   26.    Evidence will demonstrate that Plaintiff Sather was infected
15   with COVID-19 on November 23, 2020. Beyond WDOC and WCI staff, Sather had not
16   been in contact with any other individual capable of transmitting the virus
17   to his person.

18   27.    Furthermore, evidence will demonstrate that on November 23, 2020
19   Plaintiff Lawrence was not infected with the COVID-19 virus - but did live in
20   the same cell with Plaintiff Sather.

---

[14]    John Jacobi, Prison Health Public Health: Obligations and Opportunities, 31 Am. J. L. and Med. 447 (2005).

[15]    Id.

[16]    Declaration of Dr. Jaimie Mayer, Velesaca v. Wolf, et.al., DKT. 42 at ¶9, USDC of SDNY Case No. 1:20-cv-01803-AKH (S.D.N.Y. March 16, 2020).

28.    Medical evidence regarding Plaintiff Sather will show that on or before November 23, 2020, Sather's vitals recorded an average temperature above 99 to 100 degrees. However, this same body of evidence will reveal that Plaintiff Sather remained in the cell with Plaintiff Lawrence until November 28, 2020.

29.    Subsequently, Plaintiff Lawrence tested positive for COVID-19 on December 1, 2020. However, Lawrence remained in the "M-Unit" environment until December 7, 2020. During that time there was those in the same unit who had not tested positive.

30.    At all times relevant to Plaintiffs' claims, both Sather and Lawrence (who unbeknownst to them, were positive and/or exposed) unwittingly utilized communal telephones, toilets, sinks, and showers in the M-Unit living environment where uninfected incarcerated adults were housed as well.

31.    Statistics generated by the Defendants will show that by December 15, 2020, the number of those infected by COVID-19 at AHCC exceeded 1,400.[17] In contrast to AHCC's reported "Average Daily Population" (ADP) of approximately 1,910 - an infection rate egregiously exceeding seventy percent did undeniably occur in less than one month's time.

32.    AHCC is not alone in regards to such high COVID-19 infection rates among WDOC facilities. To date, the WDOC prisons which have been hit the hardest by COVID-19 outbreaks include: Airway Heights Corrections Center (reported ADP of 1,798, and 1,671 COVID-19 cases to date); Coyote Ridge

---

[17] Confirmed Cases, WDOC, supra.

1  Corrections Center (ADP of 1,823, and 400 cases to date); Larch Corrections
2  Center (ADP of 232, and 281 cases to date); Monroe Correctional Complex (ADP
3  of 1,896, and 551 cases to date); Stafford Creek Corrections Center (ADP of
4  1,772, and 1,204 cases to date); Washington Corrections Center (ADP of 1,601,
5  and 976 cases to date); and the Washington State Penitentiary (ADP of 1,916,
6  and 985 cases to date).[18]

7       33.   Given the history of epidemiologic outbreaks in WDOC facilities,
8  such as Tuberculosis, H1N1, Nora-Virus, Hepatitis, and MRSA, the Defendants
9  should have reasonably expected COVID-19 to readily spread in WDOC prisons,
10  especially when the incarcerated population cannot participate in social
11  distancing from those infected they live with, and the asymptomatic but also
12  contagious WDOC staff Defendants (knowingly in some instances) permitted
13  access to WDOC facilities.[19]

14       34.   The lack of an adequate medical infrastructure during outbreaks,
15  such as exampled by WDOC facilities, not only impacts the ability of prisons
16  to screen for COVID-19 infections, but also a prisons ability to provide
17  symptom checks among the incarcerated population because of a lack in nursing
18  staff and/or primary care providers.[20]

19  
20  [18] Id.

21  [19] See generally, Claire Fortin, A Breeding Ground for Communicable Disease: What to Do About
    Public Health Hazards in New York Prisons, 29 Buff. Pub. Interest L. J. 153 (2011); Malles v.
22  Lehigh County, 639 F.Supp.2d 566 (2009).

23  [20] See generally, Department of Corrections Response to the OCO Report on the CRCC Outbreak,
    authored by WDOC Secretary Stephen Sinclair (Nov. 30, 2020); See also, Rush, et.al., v. WDOC, et.
24  al., Thruston County Superior Court - EXHIBIT 2 (Mar. 29, 2021)(Exhibit 2 is WDOC's March 19, 2021)
    which expressly demonstrates Defendants conscious and deliberate duplicity in their responses to
25  judicial and executive oversight, especially in testing and/or keeping Plaintiffs safe).

35.    For these reasons, the risk of heightened transmission in WDOC prisons, in regards to COVID-19 and its variants, are disparately greater for the Plaintiffs and members of the class they seek to represent. WDOC's own statistics show this risk is disproportionately more than almost any other of Washington's cohort populations. Accordingly, each person in WDOC custody, being thereby in the Defendants' care, remains in grave risk of serious present and future illness and/or death from this virus under the gestalt of Defendants COVID-19 transmission prevention protocols.

C.    **Facts related to COVID-19 Health Effects:**

36.    The COVID-19 disease is known to cause severe damage to lung tissue, and has lead to a wide spread permanent loss of respiratory function. Other vital organs, such as the heart, liver, and kidneys have also been irreparably damaged.[21]

37.    Patients not killed by serious COVID-19 infections, may also face prolonged recovery periods (referred to as "long-haul" symptoms), and lasting side effects. These could include extensive rehabilitation from a loss of respiratory capacity, damage to vital organs, and/or neurological damage.

---

[21]  Medical information in this and the paragraphs that follows are drawn from the expert testimony of two medical professionals - filed in a federal case in Washington State, as well as the website of the Harvard Medical School. See Expert Declaration of Dr. Marc Stern, Dawson, et. al. v. Asher, et. al., USDC of W.D. Wash. Case No. 2:20-cv-00409-JLR-MAT (W.D. Wash. Mar. 16, 2020), https://www.aclu.org/legal-documents/dawson-v-asher-expert-declaration-dr-marc-stern; Expert Declaration of Dr. Robert Greifinger, Id., https://www.aclu.org/legal-documents/dawson-v-asher-expert-declaration-dr-robert-greifinger; Expert Declaration of Dr. Jonathan Golob, Id., https://www.aclu.org/legal-documents/dawson-v-asher-expert-declaration-dr-jonathan-golob?redirect=dawson-v-asher-expert-declaration-dr-jonathan-golob; HARVARD MEDICAL SCHOOL, CORONAVIRUS RESOURCE CENTER, As coronavirus spreads, many questions and some answers, https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center (last visited Nov. 11, 2021).

1    38.    COVID-19 and its variants are more likely to cause serious
2 illness and/or death for older adults and those with certain underlying
3 medical conditions - including, but not limited to: lung and heart disease,
4 chronic liver and/or kidney disease (such as hepatitis and dialysis patients),
5 diabetes, hypertension, epilepsy, hyperlipidemia, compromised immune systems
6 (such as from cancer, HIV/AIDS, or auto-immune disease), stroke, inherited
7 metabolic disorders, blood disorders, and developmental delay. These medical
8 conditions increase the risk of serious COVID-19 disease and long term side
9 effects for people of any age.

10    39.    Plaintiffs fall into at least two of these categories of
11 vulnerability.

12    40.    Emerging evidence suggests that COVID-19 can also trigger an
13 over-response of the immune system, further damaging tissues in a cytokine
14 release syndrome that can result in widespread damage to other organs, to
15 include, but not limited to, permanent injury to the kidneys, heart, vascular
16 system, liver, and/or neurologic injury.

17    41.    With regards to Plaintiff Sather, since contracting COVID-19,
18 laboratory testing has confirmed Sather's whiteblood counts are abnormally
19 high, and neutrophilia is present.

20    42.    With regards to Plaintiff Lawrence, since contracting COVID-19,
21 laboratory testing has confirmed Lawrence's creatine levels register at levels
22 almost seven times average healthy tolerances.

23    43.    The cause of these abnormal lab results in the Plaintiffs is
24 unknown, but is widely accepted by medical experts to cause injury to internal
25 organs.

COMPLAINT
Page 26 of 56

44.    Since May 30, 2020, Plaintiff Sather has complained of having increased neurological symptoms, including, but not limited to, headaches, complications with memory, eyesight, and on July 7, 2020, AHCC staff witnessed Plaintiff Sather having a seizure.

45.    Subsequent to being infected with COVID-19, Plaintiff Lawrence has complained to medical staff (in writing), that he is experiencing new to greater migraine symptoms and problems urinating.

46.    To date, neither Plaintiff has been subjected to a neurological examination.

47.    Generally, health care provided in Washington's prisons is under-resourced, and as a consequence, Defendants have been unable to fully and adequately meet the medical needs of those infected with COVID-19 while in their care.[22]

D.    **Facts related to COVID-19 Prevention in WDOC prisons:**

48.    The best way to prevent illness is to avoid exposure to the virus – which in the case of COVID-19, person to person contact. Evidence suggests that COVID-19 is transmitted through respiratory droplets produced by breathing, speaking, coughing, or sneezing. To prevent those droplets from exposing a person to the virus, people should wash their hands regularly, clean and disinfect frequently touched surfaces, properly wear a mask, stay at least six feet from others, and quarantine when exposure is suspected.

49.    Evidence further suggests the COVID-19 virus can be spread by

[22] Office of the Corrections Ombuds, Investigative Report, (Nov. 13, 2020), https://oco.wa.gov/ sites/default/files/COVID-19%20Workgroup%20Report%20Final.pdf

1 people who have been exposed, but remain asymptomatic.[23] According to the CDC
2 reasonable care dictates that those who are exposed/infected should quickly
3 be quarantined - for no less than 14 days.

4       50.    Reasonable care also requires swift compliance with CDC and
5 local health department guidelines - which, through expertise and trained
6 medical professionals, are qualified to interpret COVID-19 data, and with the
7 use of science, extrapolate effective methods of protecting individuals -
8 such as those in the Defendants care.[24]

9       51.    The most prevalent risk of COVID-19 exposure in prisons that
10 are under the control of the Defendants is through the staff they permit to
11 come and go each day. These staff have the potential of exposing the adult
12 population - which does not have the lawful ability to socially distance or
13 refuse physical contact with WDOC staff members, (i.e. physical searches upon
14 demand of staff are mandatory in WDOC, and can result in punishment if the
15 incarcerated adult refuses - to include, but not limited to, use of "pepper
16 spray").

17      52.    Because of WDOC's policies, and historical OCO investigations
18 which prove this to be a likely outcome in such cases, Defendants' willful
19 utilization of staff which have been exposed to COVID-19, but asymptomatic,
20 must be considered to be the more than likely cause of COVID-19 infections

---

21 [23] Centers for Disease Control & Prevention, How to Protect Yourself and Others, https://www.cdc.
22 gov.

23 [24] See Order of the WDOH Secretary, 20-03 et. seq., (effective June 26, 2020). (Defendants were
ordered to implement a WDOC mask protocol for staff and the state incarcerated population.
24 Plaintiff's evidence will show that "surgical" masks were not utilized, but instead cloth masks
were issued prior to the 2020 COVID-19 outbreaks in WDOC facilities, and it is indisputable that
25 Secretary Sinclair did not issue a "Mandatory" mask mandate until Nov. 6, 2020 - 130 days post
WDOH order 20-03.)

1  experienced by the Plaintiffs and Damages Class members.[25]

2      53.   Notwithstanding the fact that as many as 350 WDOC staff have
3  refused, or may refuse, to be vaccinated (even though under state mandate to
4  do so as a requirement of continued employment), Defendants have and had an
5  obligation to protect the Plaintiffs and members of the class from staff who
6  had been exposed to COVID-19 and/or were willfully non-complaint with the
7  social distancing, mask, and vaccine mandates. Plaintiffs and members of the
8  Damages Class allege that their COVID-19 exposure and subsequent infection is
9  not coincidental to Defendants actions and/or omissions, but the proximal and
10 foreseeable result thereof.

11     54.   For example, as late as October 18, 2021, Defendants continued
12 to permit unvaccinated staff to "frisk" search and/or cell search in WDOC
13 facilites. Though WDOC did promulgate policies of utilizing hand-sanitizers
14 and gloves between each new contact with the incarcerated population, often
15 the sanitizers were empty, not available, or changing gloves upon each new
16 contact was seemingly cumbersome – and many staff non-compliances were seen
17 by the prison population. The numerous grievances filed within the department
18 attest to this.

19     55.   By refusing the vaccine, the CDC alleges staff members are
20 more likely than not to harbor the more virulent variants of COVID-19, and
21 more likely than not to transmit those variants onto the incarcerated adults
22 in WDOC care, because these adults cannot demand social distancing from staff.

23 ────────────────────
   [25] Supra. at fn. 10

24

25

56.    Defendants above alleged decision(s) endangered those entrusted to their care by authorizing exposed and/or unvaccinated staff to disregard CDC and WDOH social distancing protocols, and as such, Defendants willfully and wantonly violated their common law duty to protect the Plaintiffs and Damages Class's health, welfare, and safety by failing to promulgate practices which permitted searches without violating social distancing guidelines.

57.    Defendants' current policies and procedures have not kept the COVID-19 virus from rampantly infecting incarcerated populations of WDOC prisons – even though quarantining, vaccinating, and social distancing are proven measures in limiting the dangers COVID-19 poses. By failing to keep exposed staff from WDOC facilities, and forcing the populations thereof to submit to physical contact with such staff members as outlined herein, the Defendants, and each of them, have forced the vulnerable populations of WDOC's twelve facilities to subject themselves to conditions ripe for being infected with COVID-19.

58.    As described herein, the Defendants' actions and/or omissions constitute an unreasonable and unacceptable threat to the health, welfare, and safety of the Plaintiffs and the putative class. Without implementation of appropriate COVID-19 prevention measures, enforced by vigilant supervision thereof – WDOC is not only putting Plaintiffs, the putative class, and their families at risk, Defendants also risk the health and lives of the communities surrounding Washington's twelve prisons.

59.    Dr. Robert Greifinger, a correctional health expert, has concluded that the most important preventative measure that prisons should take in response to the COVID-19 crises is "downsize the prison population, immediately, as appropriate based on public safety..."[26]

60.    Dr. Greifinger describes the current and future risk to people in correctional custody as "very serious, especially for those who are most vulnerable. [These individuals] may experience severe respiratory illness as well as damage to other major organs."[27]

61.    Dr. Greifinger's expert opinion is "prisons in Washington are not prepared to prevent the spread of COVID-19, treat those who are most medically vulnerable, and contain any outbreak."[28] As of December 20, 2021, Plaintiffs allege the Defendants, and each of them, have well proven this expert opinion to be accurate.

62.    Dr. Greifinger's opinion is echoed by former WDOC Secretary Dan Pacholke, who recommends based upon his own expertise and experience in WDOC, the State take immediate steps to protect incarcerated individuals, which includes releasing people from custody to increase social distancing within prisons and allow for better access to testing and treatment.[29]

---

[26] Declaration of Dr. Greifinger, at ¶18.

[27] Id. at ¶16.

[28] Id. at ¶17

[29] Declaration of Dan Pacholke, Colvin, et. al., v. Inslee, et. al., Supreme Court of Washington (Mar. 24, 2020), at ¶5.

63.    As of December 2021, WDOC facilities continue to experience COVID-19 outbreaks which require facility lockdowns. Accordingly, Plaintiffs and the Damages Class will continue to suffer irrevocable and serious physical and psychological injuries unless the Court intercedes by declaring that the Defendants have failed to meet their legal duties.[30]

E.    **Facts related to Defendants response to COVID-19 in WDOC facilities:**

64.    Defendant Jay Inslee, Governor of Washington State, did by the issuance of Emergency Proclamation 20-35, order the reduction of WDOC's prison populations on April 15, 2020. At the time of the Governor's order, WDOC's statewide 'average daily population' (ADP) was reported to be 16,282 adult incarcerated individuals. According to WDOC capacity determinations, as reported on DOC Publication 400-RE002 (6/2020), WDOC's 'ADP' was above its capacity of 16,228.

65.    WDOC reports by September of 2021, it had reduced it's prison facility totals to 12,904 incarcerated adults. Accordingly, between the month of September 2020 and September 2021, WDOC reduced it's statewide prison population by approximately 1,913 adults.[31]

66.    Subsequent to Defendant Inslee's February 29, 2020 proclaimed "State of Emergency", WDOC opened its Emergency Operations Center (EOC) at

---

[30] SEE Amicus Brief of Dr. Mary T. Basset, et al. Committee for Public Counsel Services and Massachusetts Association of Criminal Defense Lawyers v. Chief Justice of the Trial Court, No. SJ-2020 (Supreme Judicial Court for the County of Suffolk, Mar. 24, 2020), available at https://www.aclum.org/sites/default/files/field_documents/amici_letter_-_public_health_experts_-_cpcs_macdl_v._chief_of_trial_court_1.pdf.

[31] DOC Publication 400-RE002 (6/2021). This audit period is proffered to demonstrate WDOC's actual releases during the period COVID-19 impacted WDOC facilities, and how even at those ADP's, Defendants could not protect those who remained in custody.

WDOC's Olympia headquarters (HQ), on March 2, 2020, in response to COVID-19. Although the EOC's membership represented every division within WDOC, Greg Miller was appointed as the EOC's Manager. [32]

67.    On March 13, 2020, WDOC suspended visitation at all facilities and restricted access for all nonessential persons to MCC, WCC, and WCCW. Also, WDOC suspended all tours and events involving four or more outside guests at all facilities. [33]

68.    According to several press releases provided by WDOC 'HQ', the agency was cooperating with CDC and WDOH COVID-19 guidelines, on or before March 13, 2020.

69.    Between March 23, 2020 and March 27, 2020, the CDC released "The Interm Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (CDC Guidelines)".

70.    On June 26, 2020, the WDOH Secretary ordered Washington residents to "wear a face covering that covers their nose and mouth in any indoor and outdoor setting..."[34] However, the WDOH Secretary excluded WDOC facilities intentionally by authorizing the Defendants create mask mandates for those working at, and incarcerated in, WDOC facilities. [35]

---

[32] DOC Press Release (Mar. 24, 2021), One year later – Corrections' response to COVID-19, by Rachel Ericson.

[33] DOC Press Release (Mar. 12, 2020), DOC Suspending Visitation, Limiting Other Events, by Janelle Guthrie.

[34] See Generally: Order of the Secretary of Health 20-03, Face Coverings, (June 24, 2020).

[35] Id.

71.    Subsequent to the official opening of the EOC, the agency has been investigated by the Office of Correctional Ombudsman, which has filed several failures on the part of Defendants COVID-19 response. A review of the data suggests Defendants have failed to timely and/or substantially follow even the minimal standards of the CDC and/or the WDOH. Such CDC and WDOH Guidelines as:

      a.    "If an individual has symptoms of COVID-19 (fever, cough, or shortness of breath): place the person under medical isolation and refer to healthcare staff for further evaluation, ..."

         1. OCO substantiated cases where in May of 2020, those housed in CRCC were not seen by healthcare staff for up to four days after reporting, and not quarantined.

         2. Plaintiffs Sather's medical reports between November 21, 2020 and November 28, 2020, shows an elevated temp, and custody reports show he was not isolated until November 28, 2020.

      b.    "If an individual was in close contact of a known COVID-19 case (but has no COVID-19 symptoms), quarantine the person and monitor for symptoms two times a day for 14 days."

         1. OCO substantiated WDOC's practice of waiting until a positive COVID-19 test result to start a large-scale quarantine of those who were potentially exposed. In the meantime, potentially exposed individuals remained in general population among the unexposed.

2. Inmates at AHCC repetitively observed large migrations of inmates being transferred in the later months of 2020, from unit to unit throughout the facility. Often the observers themselves had not been infected with the COVID-19 virus, but within days after the insertion of these migrated inmates, the observers themselves tested positive.

3. Plaintiff Lawrence remained in the same unit, having been exposed to the known infected Plaintiff Sather for days, and having access to all unit services (i.e. phones, showers, and laundry) within M-Unit — until December 7, 2020 (approximately ten days without being isolated from those potentially unexposed).

c. The CDC Guidelines note that social distancing is a cornerstone of reducing transmission of COVID-19 and recommend that all prisons "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons."

1. Plaintiffs report they have no reasonable opportunity to increase physical space between each other.

2. For example, at AHCC's medical department, room D-135A is a 9foot by 20foot fully enclosed inmate "waiting" room where on any given day the facility "call-out" log will show up to 25 inmates can be on "call-out", and required to sit in this room.

3. WDOC's "movement" policy is by nature designed to move large volumes of incarcerated individuals throughout a facility within a "five-minute window". Failure to move by an inmate can result in punishment and/or a denial of services – to include, but not limited to medical and meals. By virtue of WDOC's five-minute movement policy, inmates are behaviorally "trained" to move in herds during movement times.

d. "Consider suspending [work] programs and other programs that involve movement of incarcerated/detained individuals in and out of the facility."

1. Plaintiffs' experience within WDOC facilities gives them the ability to allege all WCI inmate workers are still going to and from each of their units, through a pass-gate system which by design congregates and commingles several units together at a single "choke-point". For example, AHCC's "H-Foyer".

2. Upon information and belief, WCI is not daily testing its inmate work force.

3. Upon information and belief, WCI's "lean-production" practices require several inmates to touch a single material within moments of each other, and WCI does not currently provide COVID-19 sanitization training and/or a production practice which requires sanitation of these materials between each individual contact.

e.   "Incarcerated/detained persons who are close contacts of a
confirmed or suspected COVID-19 case (whether the case is
another [inmate], staff member, or visitor) should be
placed under quarantine for 14 days."

1. As substantiated by the Correctional Ombudsman, and also
presented by Plaintiff Lawrence's remaining in M-Unit
after being exposed to Plaintiff Sather's confirmed case
WDOC did not quarantine incarcerated/detained persons
who are close contacts of a confirmed or suspected COVID
case.

2. WDOC did not consistently quarantine exposed WDOC staff,
and as confirmed by Michelle Woodrow - did in fact give
exposed WDOC staff permission to enter WDOC facilities
before 14-days had elapsed since their exposure.

f.   Hard (non-porous) surface cleaning and disinfection. For
disinfection, most common EPA-registered ... disinfectants
should be effective."

1. Plaintiffs and the Damages Class are required to use
Hepastat 256 as a disinfectant, and it is used commonly
within WDOC facilities. Hepastat 256 is not an EPA-
registered disinfectant effective against the virus that
causes COVID-19. Morever, the CDC does not acknowledge
Hepastat 256 among any disinfectant for COVID-19.[36]

---

[36] https://www.wfsb.com/news/agency-lists-cleaning-products-that-combat-coronavirus/article_59c3d
37e-5ccf-11ea-8e5c-13059e5b1e1d.html.

**F.**    **Facts related to Defendants individual direct and/or indirect causation and personal involvement regarding the heightened exposure of COVID-19 in WDOC facilities and the resulting unnecessary and wanton infliction of the serious and deadly COVID-19 disease on the Plaintiffs and the Damages Class.**

72.    Early on in the pandemic, Defendants created policies and protocols they claimed would avoid huge outbreaks in Washington's prisons.

73.    They implemented a variety of practices and other measures in an attempt to keep COVID-19 from entering the prisons and to reduce its spread once that occurred.

74.    On or around April 10, 2020, the Defendants by memo directed WDOC staff to wear face coverings. However, within the Defendants' memo staff were given a "voluntary" discretionary option to not wear masks.

75.    Thereafter, however, Defendants were aware that many WDOC staff refused to wear masks inside WDOC facilities. Awareness came from, but not limited to:

        a.    Numerous filed offender grievances system wide;

        b.    The OCO's November 13, 2020 investigative report;

        c.    Statements of Anonymous CRCC Incident Command Team staff.

76.    On June 26, 2020, the WDOH directed the Defendants to create a mandatory mask policy within WDOC. However, Defendants were deliberately indifferent to the rights of the Plaintiffs and the Damages Class by failing to act on the WDOH's directive until November 6, 2020 – a mere 13 days before WDOC facilities experienced the greatest one month outbreak recorded in WDOC prisons, and over one-hundred and thirty days from the WDOH's notice to act.

77.    Unfortunately, as evidenced by the large number of people who subsequently became infected, Defendants created policies and protocols have proven to be disastrously ineffective.

78.    Between April 2020 and the filing date of this Complaint, WDOC, including each of the Individual Defendants, has failed to take meaningful and adequate steps in response to the COVID-19 pandemic, as evidenced by the ever increasing numbers of infected within WDOC facilities.

79.    WDOC experienced a huge explosion of COVID-19 cases in a number of its facilities beginning in May of 2020 and continuing into February 2021. However, WDOC facilities continue to experience COVID-19 outbreaks within its facilities on smaller scales.

80.    On November 30, 2020, WDOC reported having 378 active COVID-19 cases within its facilities. By December 15, 2020, WDOC reported 1,727 active cases. On January 4, 2021, the number of active cases in WDOC facilities more than doubled to 3,519 active cases being reported. Since that date there has been nearly 2,000 additional cases reported, with new cases being reported each week.

81.    Though Defendants have failed to explain how COVID-19 entered WDOC's impacted facilities when they were essentially closed to everyone but essential staff weeks before these facilities experienced their outbreaks, it is more likely than not that these massive outbreaks were caused by infectious WDOC staff who infected the Plaintiffs and member of the Damages Class. This causal probability is made more likely than not because, but not limited to:

> (a) Defendants informed but wanton decision to direct exposed WDOC staff to don extra PPE, symptom check, and remain working in WDOC's facilities versus quarantining.
>
> (b) Defendants informed but wanton decision to direct WDOC staff to wear masks on a voluntary basis prior to November 2020.

COMPLAINT
Page 39 of 56

82.    Once inside, the virus spread quickly and dangerously within WDOC facilities due to the lack of, but not limited to:

    (a) the lack of social distancing, and especially between those showing symptoms and those forced to live in proximity to with symptoms.

    (b) the lack of quarantining protocols while awaiting test results.

    (c) poor facility designs, to include but not limited to the recycled air systems.

    (d) the lack of EPA registered disinfectants.

    (e) the lack of surgical masks for the incarcerated.

    (f) the failures by staff and others to follow safety protocols and other shortcomings.

83.    When the Defendants became overwhelmed with the magnitude of the disaster, and faced with limited options, people held in quarantine did experience long periods of degrading and disgusting conditions, to include, but not limited to:

    (a) access to consistently operational toilets while suffering from COVID-19 symptoms such as diarrhea. Sometimes being given limited access as a matter of staff willingness to provide – which could include periods of up to four hours between access.

    (b) being denied showers for days to weeks.

    (c) being denied clean clothing for days.

    (d) being held in rooms with leaking roofs during winter weather conditions.

(e) being held in rooms with a malfunctioning heating system during winter weather conditions as low as 34 degrees Fahrenheit. Often causing the rooms to drop below 50 degree temperatures while housing those WDOC considered the most impacted by the COVID-19 virus.

84.    Though given ample notice, resources, and opportunity to plan between January and November of 2020, to include smaller outbreaks by which to learn from, WDOC prisons still experienced severe overcrowding in certain quarantined areas, where infected adults were forced to sleep on the floor as WDOC staff repeatedly reported to Defendant Inslee "there is enough space at Airway Heights, according to Defendant Inslee's spokesperson - Tara Lee.

85.    In regards to quarantine space, Defendants directed and/or knowingly permitted WDOC staff to repeatedly shuffle infected people between units and cell blocks.

86.    These movements have spread COVID-19 as people with the virus came into contact with the environments of people who were not yet infected. The constant churn of people throughout the prisons and the lack of available locations to hold the infected, has led to widespread contamination between units. As a policy, practice, or protocol, such actions are not congruent to CDC or WDOH quarantine guidelines/directives.

87.    In addition to the above acts which were deliberately made, and indifferent to the health, welfare and safety of the putative class, the Defendants initially provided everyone with surgical masks which had a proven effectiveness against COVID-19, but those were replaced on the direction of the Defendants - to cloth masks/bandannas produced by WCI, for a financial federal remuneration which benefited the Defendants fiscally.

88.    The 2020–21 winter COVID–19 outbreaks in WDOC facilities are the utterly foreseeable results of what a reasonable person would conclude was deliberately indifferent decisions made by the Individual Defendants, and each of them.

89.    In fact, history has proven that the Defendants have failed to take appropriate and adequate steps to promptly prevent, test, and treat the COVID–19 virus across all WDOC facilities, system–wide and at each individual facility.

90.    Among other things, Defendants have knowing and decisively failed to:

     (a)  Promptly implement and enforce mask policies, across the WDOC system and which apply to WDOC staff and incarcerated adults equally, which meaningfully and adequately protect against the spread of COVID–19;

     (b)  Promptly and continuously provide surgical masks to both WDOC staff and incarcerated adults under Defendants care and supervision – equally;

     (c)  Promptly provide adequate space for incarcerated adults or WDOC staff to socially distance from other inmates and staff;

     (d)  Promptly implement and enforce quarantine and non–mixing policies, across the WDOC system and at each individual WDOC facility, sufficient to protect against the spread of COVID–19;

     (e)  Promptly and continuously provide adequate EPA–registered cleaning materials to clean and sanitize congregate living areas;

(f)    Promptly and continuously clean and adequately sanitize public areas, including with CDC recognized disinfectants;

(g)    Promptly and continuously administer medical checks and quarantining within an hour of an individual showing symptoms of, or being exposed to, COVID-19; and

(h)    Promptly, consistently, and adequately screening WDOC staff and other individuals entering WDOC facilities, as well as denying asymptomatic individuals access thereto, for COVID-19 exposure and/or infection.

91.    As a result of the State's direct and/or indirect decisions, thousands of incarcerated adults were infected with the COVID-19 virus in one variant or another, and at least 14 of those infected, have died as a direct consequence of being infected with COVID-19 while in the Defendants care.

92.    Undoubtedly, due to the number of incarcerated adults exposed to the coronavirus because of the State's deliberate indifference to their constitutional rights, many people will likely suffer the long-term health effects now associated to COVID-19 infections – which were avoidable. However, the State continues to act or refuse to act on grounds generally applicable to the proposed class, thereby making appropriate final declaratory and injunctive relief with respect to the putative class as a whole.

93.    The poor state of health care, as repetitively proven in other litigations, in Washington's prisons before COVID-19 would bring a reasonable person to conclude, will be more strained or will invite system wide failures in the treating of long-term COVID-19 symptoms, under the additional burden of caring for those currently infected with COVID-19, and those with COVID-19 related chronic health needs.

94.    The Defendants, in over eighteen months, have neither yet reckoned with this long term obligation, nor received the resources necessary to meet it.

95.    The State's efforts to date have not protected incarcerated adults in Washington's prisons from heightened exposure to COVID-19, and as a direct and/or indirect result of their best policies, practices, and COVID-19 prevention protocols, COVID-19 outbreaks remain a reality in WDOC facilities.

G.    **Further population reduction within WDOC facilities is urgent.**

96.    Courts, public health experts, and corrections professionals agree that significantly down-sizing prison populations is the most important tool to combat the spread of COVID-19 among incarcerated adults.

97.    Dr. Marc Stern, the former Assistant Secretary of Health Care for the Washington State Department of Corrections states: "Downsizing jail populations serves two critical public health aims: (1) targeting residents who are at elevated risk of suffering from severe symptoms of COVID-19 and (2) allowing those who remain incarcerated to better maintain social distancing and avoid other risks associated with forced communal living."[37]

98.    After reviewing the specific conditions in numerous jails and prisons, Dr. Stern was "firmly convinced that downsizing the inmate population as much as possible will reduce the risk of contraction and transmission of COVID-19 — and the attendant risks of serious harm and death."[38] Dr. Stern's expert opinion is that downsizing the population of the prison will "help to

---

[37] See supra n. 21 at ¶ 13.

[38] Id. at ¶ 11.

1  'flatten the curve' overall – both within the jail setting and without."[39]

2  That is because, given the churn of people – as utilized by the Defendants

3  during the AHCC outbreak – within WDOC's facilities, the outbreak of COVID-19

4  in the prison will be impossible to confine to the WDOC facilities, as well as

5  keeping those incarcerated within the prison from contracting the virus.

6      99.    Dr. Jaimie Meyer, Assistant Professor of Medicine at the Yale

7  School of Medicine, and former Infectious Disease physician for the York

8  Correctional Institute in Connecticut, also reviewed the spread of COVID-19

   in many facilities, and came to the same conclusion: "Reducing the size of the

9  population in jails and prisons is crucially important to reducing the level

10 of risk both for those within those facilities and for the community at

11 large."[40] Dr. Meyer emphasized the risk that prisoners like the Plaintiffs

12 and putative class members would contract COVID-19, and the risk that they

13 would suffer serious illness and death from the infection.[41] Because of the

14 "significantly higher risk" to prisoners, Dr. Meyer writes that, "from a

15 public health perspective," she is "strongly of the opinion that individuals

16 who are already in those facilities should be evaluated for release."[42]

17     100.    The New England Journal of Medicine published, "Flattening the

18 Curve for Incarcerated Populations--Covid-19 in Jails and Prisons," which also

19 advocates for "releasing as many people as possible, focusing on those who are

20 least likely to commit additional crimes, but also on the elderly and infirm[.]"

---

21 [39] Id. at ¶ 14.

22 [40] See supra n. 16 at ¶ 34.

23 [41] Id. at ¶ 33.

24 [42] Id. at ¶ 35.

25

1    Decarceration "will help flatten the curve of COVID-19 cases among incarcerated

2    populations and limit the impact of transmission both inside correctional

3    facilities and in the community after incarcerated people are released. Such

4    measures will also reduce the burden on the correctional systems in terms of

5    stabilizing and transferring critically ill patients, as well as the burden

6    on the community health care system to which such patients will be sent."[43]

7    To promote public health, we believe that efforts to decarcerate, which are

8    already under way in some jurisdictions, need to be scaled up; and associated

9    reductions of incarcerated populations should be sustained. The interrelation

10   of correctional-system health and public health is a reality not only in the

     United States but around the world."

11       101.    According to former WDOC Secretary Dan Pacholke, Defendants

12   could comply through several mechanisms to ensure that those unduly dangerous

13   prisoners remain in custody. These include establishing selection criteria

14   based on criminal history, and current physical capacity. Procedures include

15   an increase in the earned "good-time" available to incarcerated adults, a

16   release to community custody and/or home confinement, advancing release dates

17   of prisoners with severe medical conditions which would make them more than

18   likely to be harmed in the long term because of a COVID-19 infection.

19       102.    Further compliance could come in the form of passed legislation

20   such as House Bill 1282 - which, if passed, would permit inmates to earn good

21   conduct credits towards release - and reduce WDOC's population by thousands.

_____

[43] See: Matthew J. Akigama, M.D., Anne Spaulding, M.D., Josiah D. Rich, M.D., Flattening the
22   Curve for Incarcerated Populations—Covid-19 in Jails and Prisons, N. Eng. J. Med. (Apr. 2, 2020)
     available at https://www.nejm.org/doi/pdf/10.1056/NEJMp2005687?articleTools=true.

23

24

25
                                   COMPLAINT
                                  Page 46 of 56

103.    Though Defendants have released incarcerated adults from WDOC facilities, these releases are typically WDOC's outlying facilities, and not from the institutions most impacted by COVID-19 in 2020-21. According to WDOC population audits, facilities such as AHCC continue to sustain an eighty-three percent of their population capacity - roughly equal to the exact percentage of incarcerated adults which became infected by COVID-19 under the Defendants currently relied upon COVID-19 prevention protocols - the same measures which continues to aid in the ever increasing numbers of the Damages Class.

104.    To vindicate Plaintiffs' and putative class members' rights under the Eighth Amendment, this Court may find it necessary, if other relief is insufficient to avoid further harm and provide appropriate and effective prevention and medical care, to request the convening of a three-judge court to determine whether a prisoner release order should be entered. In doing so, the Court would join several other jurisdictions which have recognized what public health experts and correctional professionals have testified to as the soundest way to avoid a constitutional and community crisis: to rapidly and thoroughly downsize the populations at correctional institutions.

105.    Across the United States extraordinary as well as unprecedented measures affecting ever aspect of life have been or are currently being taken in the name of protecting people from COVID-19. Because of the particular threats to Plaintiffs' health as members of the groups of people most at risk for severe COVID-19 illness and long-term symptoms, Plaintiffs should be given the adequate care recommended by health experts, including their release, if the Defendants are not amenable to them being confined by method of electronic monitoring at home. WDOC and the Individual Defendants cannot continue to cause the Plaintiffs and members of the Damages Class to suffer the above cruel and inhumane conditions as a method of punishment for their crimes.

# VI.    CAUSES OF ACTION

## CLAIM 1
## Violation of the Eighth Amendment
## (42 U.S.C. § 1983)

### All Plaintiffs against Individual-Capacity Defendants

1.    Plaintiffs reallege and incorporate sections I. through V. as if fully set forth herein.

2.    The Eighth Amendment to the U.S. Constitution, as incorporated against States though the Fourteenth Amendment, guarantees that prisoners may not be subjected to cruel and unusual punishment by State actors. Although Washington's Constitutional Articles, and more specifically, Const. Art. I., §14 encompasses "cruel punishment", it does not speak upon the behalf of the Plaintiff's "unusual" punishment alleged herein. Specifically, prisoners in state custody have an inalienable right to be protected against a heightened exposure to a serious communicable disease, which includes COVID-19. Here, Defendants were deliberately indifferent to the rights of Plaintiffs and the members of the class to be protected from such exposure.

3.    Defendants, and each of them, were deliberately indifferent to the rights of the Plaintiffs, and members of the Damages Class, including to their rights to be protected from heightened exposure to a serious and deadly communicable disease like COVID-19. Defendants therefore acted in violation of the Eighth Amendment. Among other things, Defendants, and each of them,

      (a)    failed to promptly, adequately, and continuously cause a mask mandate to be implemented and enforced with respect to all WDOC employees, WCI employees, and incarcerated adults;

(b)    failed to promptly and continuously provide appropriate PPE to incarcerated adults, and more specifically – surgical masks;

(c)    failed to properly implement and enforce guidelines and/or procedures relating to sanitation and disinfection of areas in WDOC institutions where forced congregated individuals could contract and/or become exposed to COVID-19;

(d)    failed to follow CDC and WDOH Guidelines and implement the prescribed necessary public health measures to protect against the spread of COVID-19 in WDOC institutions, including, but not limited to, by failing to implement and enforce the proper quarantines and/or social distancing for individuals who had contracted or become exposed to COVID-19 and by allowing mixing between and among adults in custody – to include, but not limited to, exposed WDOC and WCI staff – without regard to the risk that adults in custody would or could become exposed to COVID-19;

(e)    creating and maintaining inhumane conditions in the prisons as described herein, though Defendants demonstrated they had readily available alternatives that they willfully chose not to utilize;

(f)    allowing WDOC and WCI employees who have refused to take the vaccine to have direct physical and unmitigated contact with Plaintiffs and members of the class; and

(g)    failed initially to prioritize eligible adults in custody for COVID-19 vaccine distribution.

1    4.    In doing so, Defendants, and each of them, acted with callous

2 disregard for the rights, serious medical needs, and physical safety of the

3 Plaintiffs and the members of the Damages Class.

4    5.    Furthermore, by operating and continuing to operate WDOC

5 prisons contrary to CDC and WDOH guidelines and/or in a manner that lacked the

6 capacity to treat, test, prevent, and/or protect the Plaintiffs and putative

7 class against a COVID-19 spread and/or outbreak such as remains ongoing in

8 WDOC facilities, Defendants, and each of them, as direct participants and the

9 ultimate policy makers for the WDOC facilities and the WDOC's response to the

10 COVID-19 pandemic, they have violated the rights of the Plaintiffs and the

11 putative class to be protected against heightened exposure to COVID-19. In

12 operating WDOC's facilities outside of CDC and WDOH guidelines, Defendants,

13 and each of them, acted with callous disregard for the rights, serious medical

14 needs, and physical safety of the Plaintiffs and the members of the Damages

15 Class.

16    6.    As to the Damages Class, Plaintiffs Sather, Lawrence, and any

17 other Plaintiff or class member who develops and/or is diagnosed with COVID-19

18 while incarcerated in a WDOC facility, is entitled to damages against the

19 Defendants, and each of them, for pain, suffering, harms, and losses resulting

20 from COVID-19. Plaintiffs and the members of the Damages Class are further

21 entitled to an award of punitive damages in an amount to be proven at trial.

22    7.    Defendants, and each of them, have a constitutional duty to

23 protect the Plaintiffs and the members of the Damages Class from cruel and

24 unusual punishment.

25    8.    Plaintiffs are entitled to recover attorney's fees. 42 U.S.C.
§ 1988.

**CLAIM 2**
**Negligence**
**Damages Class against All Defendants**

9.   Plaintiffs reallege and incorporate sections I. through V., and paragraphs 1-7 of section VI. as if fully set forth herein.

10.   Defendants, and each of them, in acting or failing to act in the manner described in this complaint, were acting in the course and scope of their employment with the State of Washington, WDOC, and/or WCI.

11.   Defendants, and each of them, were negligent in one or more of the follow ways that caused harm to Plaintiffs Sather, Lawrence, and the members of the Damages Class:

   (a)  In failing to promptly and continuously ensure that WDOC employees, WCI employees, and incarcerated adults wear and/or continue to properly wear CDC/WDOH approved masks;

   (b)  In failing to adequately and daily screen employees for COVID-19 symptoms and/or exposure upon entry to WDOC;

   (c)  In failing to quarantine and/or deny exposed WDOC/WCI staff access to WDOC facilities;

   (d)  In failing to provide adequate sanitation and/or CDC/WDOH approved disinfectants in WDOC facilities;

   (e)  In failing to train WDOC/WCI staff to require enforcement of adequate sanitation and disinfection in WDOC prisons;

   (f)  In failing to arrange adequate housing, alternative incarceration, or, if necessary, adequate releases to achieve appropriate social distancing;

   (g)  By permitting, creating, and/or maintaining inhumane and unusual punishment conditions in WDOC prisons;

(h)   In failing to utilize the authorized and available
      alternatives given them by the State, and doing so only
      in regards to financial reasons versus a regard for the
      serious medical needs of the Plaintiffs and putative
      class members;

(i)   In failing to utilize the authorized and available
      alternatives given them by the State, and doing so only
      in regards to financial reasons versus a regard for their
      duty to protect the rights and physical safety of the
      Damages Class;

(j)   In failing to prioritize eligible incarcerated adults for
      vaccinations according to the State's corresponding
      vaccine phases;

(k)   In failing to properly quarantine incarcerated adults
      that were awaiting COVID-19 testing results;

(l)   In failing to properly quarantine incarcerated adults
      which were housed with adults which had confirmed
      COVID-19 infections;

(m)   In allowing mixing between and among incarcerated adults
      and exposed WDOC/WCI staff without regard to the risk
      that incarcerated adults would or could become exposed,
      though they had readily available staffing alternatives
      through the National Guard which they willfully chose not
      appropriately utilize; and

(n)   In allowing WDOC/WCI staff who have refused to take the
      vaccine to have physical contact with the Damages Class.

COMPLAINT
Page 52 of 56

12.    Plaintiffs Sather, Lawrence, and all members of the Damages Class suffered harm as a result of Defendants' negligence, including, but not limited to: pain and suffering, disability, and permanent injury resulting in economic and non-economic damages in amounts to be proven at trail.

### VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

    a.    Injunctive relief in the following particulars:

        1.    Order Defendants to provide spacing of at least six feet or more between inmates in WDOC facilities so that social distancing can be accomplished at a minimum in each cell to prevent the spread of COVID-19;

        2.    Order Defendants to clean and exceptionally maintain each of WDOC's facility ventilation systems, including, but not limited to, utilization of 'HEPA' grade filters, and if already being utilized, order the Defendants to change filters, as well as, clean ventilation systems more regularly;

        3.    Order Defendants to institute and enforce a CDC/WDOH compliant safety plan which reasonably prevents COVID-19 outbreaks and institutional wide spreading;

        4.    Order Defendants to enforce WDOC staff, agents, and any contractor seeking access to WDOC facilities, to properly and consistently wear a face covering as already mandated by State and Federal regulations, to include, but not limited to levying penalties against non-complaint staff;

5. Order Defendants to permit adults in custody to have readily available and reasonable access to CDC registered disinfecting solutions for the purpose of sanitizing and disinfecting frequently touched objects, cells, common areas, and work areas;

6. Order Defendants to waive all medical co-pays for inmates experiencing possible COVID-19 symptoms;

7. Order Defendants to provide access to Specialty care in regards to those adults having contracted COVID-19 and has long term and/or reoccurring heart, lung, vascular, and/or any neurological symptoms which could be resulting from their COVID-19 infection;

8. Enjoin Defendants and their agents from retaliating against adults in custody for reporting symptoms, seeking redress administratively, and/or seeking relief from the Court;

9. Order Defendants to provide single-cell quarantining of persons who have come into contact with person known or suspected to have COVID-19, isolation with proper medical checks for those who are experiencing COVID-19 symptoms, and safe housing for individuals as appropriate and without incorporating disciplinary characteristics to those preventative housing assignments;

10. To the extent that other remedies prove inadequate after the Defendants have had expedited opportunity to comply,

appoint a three-judge panel for the purpose of reducing WDOC's prison populations through safe means such as, but not limited to, inmate paid home confinement so that adequate social distancing, quarantining of suspected cases, medical isolation of confirmed cases, and safe housing for WDOC prisoners can be accomplished;

11. Any other injunctive remedy the Court sees just and fit to address the constitutional violations outlined herein.

b. Declaratory relief in the following particulars:

1. Certify the petition as a class action and approve the class proposed by the Plaintiffs pursuant to FRCP 23(b)(1),(b)(2),(b)(3), and FRCP 23(c)(4);

2. Designate Plaintiffs as class representatives pursuant to FRCP Rule 23(a)(4);

3. Declare that Defendants have violated their common law duty to protect the Plaintiffs' and the class's health, welfare, and safety;

4. Declare that the Defendants have violated their Eighth Amendment duty to keep Plaintiffs and the class free from cruel and unusual punishment;

5. Declare that the Defendants have been deliberately and continuously indifferent to the rights of the Plaintiffs Damages Class;

6. Declare that the Defendants have acted negligently in the response to COVID-19, and that said negligence directly and/or indirectly harmed the Plaintiffs and the class;

7.   Declare that joinder is impracticable, that the common
questions of fact and law are complex, and that the
totality of conditions are manifestly intertwined, and
judicial economy is best served by the appointment of
Class counsel pursuant to 28 U.S.C. § 1915(e)(1) because
there does exist a risk of an imminent danger and/or a
continued risk of serious physical injury to the health,
welfare, and safety of the Damages Class.

c.   On all of Plaintiffs' claims for relief, compensatory damages
for pain and suffer and harms and losses in amounts to be
proven at trial;

d.   On Plaintiffs' first claim for relief, an award of punitive
damages in an amount to be proven at trial;

e.   Reasonable attorneys' fees and costs pursuant to 42 U.S.C. §
1988; and

f.   Such other relief as the Court deems just and proper.

Respectfully submitted on 28 JAN           , 2022.

TOBIN SATHER
Plaintiff, Pro - Se

KENNETH LAWRENCE
Plaintiff, Pro - Se

COMPLAINT
Page 56 of 56